UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

JACOB R. LOYD,

                   Defendant.
———————————————————————————

<u>REPORT & RECOMMENDATION</u>

19-CR-6186CJS

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated November 7, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 22).

On November 7, 2019, the grand jury returned a five-count indictment against defendant Jacob R. Loyd ("Loyd"). (Docket # 20). Count One charges Loyd with carjacking, in violation of 18 U.S.C. §§ 2119(1) and 2. (*Id.*). Count Two charges Loyd with possession and use of a firearm in furtherance of the crime of violence charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (*Id.*). Count Three charges Loyd with possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (*Id.*). Count Four charges Loyd with possession of a firearm in furtherance of the drug trafficking crime charged in Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(i). (*Id.*). Count Five charges Loyd with possession of marijuana, in violation of 21 U.S.C. § 844(a). (*Id.*).

Currently pending before the Court for report and recommendation are Loyd's motions to suppress tangible evidence and statements, as well as evidence of a photographic identification. (Docket # 29 at 5-9).[1] An evidentiary hearing was held on January 23, 2020, at which the government elicited testimony from Rochester Police Department ("RPD") Officer Chad Brady ("Brady"), who was involved in Loyd's arrest on the night of June 16, 2019, and RPD Police Investigator Ebony Brown ("Brown"), who conducted the photographic identification procedure on June 20, 2019. (Docket # 36).[2] Loyd did not present any witnesses. (*Id.*). Subsequent to the hearing, both Loyd and the government submitted post-hearing briefs (Docket ## 39, 40), which the Court has considered. For the reasons discussed below, I recommend that the district court deny Loyd's motions.

## REPORT & RECOMMENDATION

### I.     Motion to Suppress Tangible Evidence and Statements

I turn first to Loyd's motion to suppress tangible evidence and statements obtained following his arrest on June 16, 2019. (Docket ## 29 at 5-8; 39 at 4-9). Loyd's sole contention is that the RPD officers did not have probable cause to arrest him without a warrant for allegedly urinating on the side of a building and that the evidence and statements obtained following that allegedly unlawful arrest should be suppressed as the fruit of the poisonous tree.[3]

---

[1] Loyd's omnibus motions sought a variety of other relief. (Docket # 29). The other issues raised by Loyd's motions were decided by the undersigned or resolved by the parties in open court on January 7, 2020. (Docket # 33).

[2] Citations to the transcript of the January 23, 2020 hearing shall be referred to as "Tr. __."

[3] Loyd has clarified several times that he seeks to suppress his statements only on the grounds that they are "fruit of the poisonous tree[,] [namely] . . . [the] illegal search and seizure." (Tr. 2-3). When he initially moved to suppress statements, in addition to the fruit of the poisonous tree contention, defense counsel suggested that Loyd's statements may have been obtained in violation of his *Miranda* rights. (*See* Docket # 29 at 7 ("even if Loyd w[as] later read his *Miranda* rights, there is no evidence that Loyd executed a knowing and voluntary waiver of those

(Docket ## 29 at 7; 39 at 8-9).  The government counters that the RPD officers had probable

cause to arrest Loyd based on their personal observations of him[4] and that the evidence Loyd

seeks to suppress was thus permissibly obtained through a search incident to a lawful arrest.

(Docket ## 30 at 7-8; 40 at 7-13).

### A.     Background

On January 23, 2020, this Court held a suppression hearing to develop the factual

record concerning Loyd's warrantless arrest on June 16, 2019, which ultimately resulted in the

tangible evidence seized and the statements made by Loyd later that night.  (Docket # 36).  For

this portion of the hearing, the government called RPD Officer Chad Brady to testify.  (Tr. 4-63).

Brady testified that he has been a police officer for approximately seven years, serving as a

patrol officer with the RPD for about the past five years, and prior to that serving with both the

Village of Brockport Police Department and the East Rochester Police Department.  (Tr. 5, 50).

Brady successfully completed a six-month police academy training course prior to becoming an

officer.  (Tr. 6).

Brady was on duty as a patrol officer on June 16, 2019, working the 3 p.m. to

11:15 p.m. shift.  (*Id.*).  During that shift, Brady wore an RPD uniform, a body camera, and

---

rights")).  At oral argument on January 7, 2020, defense counsel represented that he had reviewed the recording of
Loyd's post-arrest interrogation and affirmed that Loyd was read his *Miranda* rights and responded to questioning
afterwards.  (*See id.*).  Loyd again confirmed at the suppression hearing and in his post-hearing memorandum of law
that his motion to suppress statements is based solely on the fruit of the poisonous tree argument.  (*See* Tr. 2-3
("[t]here was a videotape [of Loyd's interrogation] and it's clear that Mr. Loyd was read his Miranda rights[,] [s]o
we don't believe there are any issues with regard to that"); *see also* Docket # 39 at 9 ("[b]ecause the arrest and
subsequent search were illegal, all of the fruits that came from them must be suppressed under the exclusionary
rule[;] . . . [h]ere, following the arrest, the . . . the statements that [Loyd] made while being interrogated should be
suppressed as being the fruit of the poisonous tree")).  On this record, this Court limits its analysis to that issue only.

[4]  The government argued in its initial papers that the RPD officers had reasonable suspicion to conduct a
*Terry* stop of Loyd.  (Docket # 30 at 5-6).  In its post-hearing brief, however, the government argues that Loyd's
arrest was supported by probable cause.  (Docket # 40 at 7-9).  Loyd disputes that the RPD officers had "probable
cause to conduct the warrantless arrest of [him]."  (Docket # 39 at 6).  In other words, the parties now appear to
agree that probable cause is the appropriate standard under which to assess the RPD officers' encounter with Loyd.

operated a marked patrol vehicle.  (Tr. 7).  At approximately 9:30 p.m., Brady, RPD Officer

Lindauer ("Lindauer") and RPD Officer Ricotta ("Ricotta") were traveling southbound on North

Street in the City of Rochester, approaching the intersection of North Street and Roycroft Drive.

(Tr. 7, 27-28).  Each officer was traveling separately; Lindauer was driving in front of Brady in

an unmarked patrol vehicle, and Ricotta was driving a marked patrol vehicle behind Brady.

(Tr. 27-28).  Brady indicated that he was "[v]ery" familiar with this area, as he had worked in

this area for approximately two years before being transferred to the "Goodman section" of the

City of Rochester.  (Tr. 8).  Brady considered this area to be a "high crime area," and he testified

that it is not unusual for three police cars to travel together in order "to be proactive in the high

crime environment that [they] work in."  (Tr. 8, 55).

       As the officers traveled southbound on North Street, Lindauer used a secure

channel to communicate with Brady that they were approaching a group of men.  (Tr. 28).  Brady

testified that at that point he noticed a group of four to five men on the west side of North Street

at the intersection of North Street and Roycroft Drive.  (Tr. 9).  As Brady passed the group, he

also observed one man "facing the building on the northwest side of the intersection [who]

appeared to be urinating against the building."  (Tr. 9, 31).  Brady testified that he only saw the

man's side profile; he observed that the man was "facing the building inches away, hands in his

groin area, pants pulled down."  (Tr. 9, 29).  Brady also indicated that the man's pants were

"[m]aybe" five or six inches "above the knee," that he was wearing boxer brief underwear, and

that he appeared to be trying to "shield himself from the public."  (Tr. 33-34).  Based upon his

experience of having observed men urinating in public "many times" throughout his life, even

though Brady did not observe the individual's genitals, a stream of urine, or "anything indecent,"

Brady believed that the man's "mannerism[s]" and conduct indicated that he was urinating.

(Tr. 32-33, 59).  Brady testified that the area where he observed the group of men and the

individual by the building was illuminated by "[t]ypical street lighting," which allowed him to

observe the events and that his view of the man near the building was unobstructed.  (Tr. 9).

        After observing the individual near the building who appeared to be urinating,

Brady parked his car at the intersection of North Street and Roycroft Drive, and he, Lindauer and

Ricotta exited their patrol cars to address the men.  (Tr. 9-11, 14).  According to Brady, as the

officers approached, the man near the building "immediately pulled his pants up and walked

towards – away from the building towards the street, towards [the] officers," but not before "one

of [the individual's] friends appeared to notify him that [the officers] were pulling up."  (Tr. 10,

61).  Brady clarified that the man he believed had been urinating had been standing near the

building on property that he assumed was private; in other words, he was not standing on the

public sidewalk or other public property.  (Tr. 42).

        Brady described the man as a "black male with shoulder length hair" who was

wearing a white t-shirt, sweatpants, and had a black satchel around his neck.  (Tr. 10-11).  Brady

indicated that he later identified the man as the defendant Jacob Loyd.  (*Id.*).

        Brady testified that the sole reason that he and his fellow officers approached

Loyd was because they believed Loyd was urinating on the building.  (Tr. 34).  According to

Brady, as he and Lindauer reached Loyd, Brady told Loyd that "he could not be urinating on the

side of the building."  (Tr. 11-12).[5]  Brady also testified that he observed what he believed to be

---

[5]  The officers' body camera footage was admitted into evidence at the hearing and has been reviewed by
this Court.  Lindauer's body camera footage demonstrates that as he approached Loyd, one officer said to Loyd,
"pissing?" and another officer said to Loyd, "you can't just pee."  (*See* Government's Exhibit ("G. Ex.") 5 at
21:30:23).  Moreover, when Loyd asked the officers what he had done as he was being arrested, one officer can be
heard saying, "pissing on the side of the building, disorderly conduct, serves no legitimate purpose."  (*See id.* at
21:30:51).

urine on the side of the building as he was walking up to Loyd.  (Tr. 62).[6]  According to Brady, Loyd appeared to be "very intoxicated," which Brady concluded based on Loyd's bloodshot and squinted eyes, his mannerisms, and his speech.  (Tr. 57-58).  Brady grabbed Loyd's left arm, Lindauer grabbed Loyd's right arm, and they detained and handcuffed him.  (Tr. 11, 45, 47).  Loyd did not resist.  (Tr. 45).  Brady testified that he told Loyd he was placing him under arrest for "urinating on the building."  (Tr. 34, 43).

When Brady and Lindauer grabbed Loyd, Brady felt Loyd "tense[] up a little bit," which Brady testified was unusual.  (Tr. 11, 44).  According to Brady, although he was unsure whether Loyd was armed, he feared for his safety when he felt Loyd tense up.  (Tr. 44).  After placing Loyd in handcuffs, Brady and Lindauer performed a pat frisk for "officer safety." (Tr. 11, 45, 53).  Lindauer patted Loyd's right side, while Brady patted Loyd's left side, "to make sure [Loyd] didn't have any weapons or anything crazy that could hurt him[] or other officers after he was placed in the patrol vehicle."  (Tr. 12).  Brady testified that he pat frisked Loyd from his left shoulder down to his left ankle, and when Brady "got to [Loyd's] left sweatpants pocket area, [he] noticed a heavy object[.]"  (Tr. 12, 13).  Brady then "took a step back and looked and saw just a few inches sticking outside of the pocket a round metal object [that] appeared to be a barrel [of a handgun]."  (Tr. 13).  Brady "took [his] flashlight out, peered into [Loyd's] pocket and observed the firearm inside the pocket."  (*Id.*).  Brady removed the gun from Loyd's pocket, and Lindauer secured it after Loyd was placed in the patrol vehicle.  (*Id.*).

Brady also testified that Loyd was carrying a satchel around his neck, which appeared similar to a "fanny pack."  (Tr. 13, 46).  Brady testified that once Loyd was placed in handcuffs, but before Brady discovered the handgun, Ricotta removed the satchel from Loyd's

---

[6]  Brady testified that he took a "closer look" at the building after Loyd was detained and observed urine on the building.  (Tr. 62; *see also* G. Ex. 3).

neck and began searching it as Brady and Lindauer pat frisked Loyd.  (Tr. 14).  Brady testified

that Ricotta discovered a set of Volkswagen car keys and a Samsung cell phone in a red case.

(Tr. 14, 26-27).[7]

       After his arrest, Loyd was placed in Lindauer's patrol vehicle and transported to

RPD's east-side division office at 630 North Clinton Avenue.  (Tr. 15, 48).  After arriving, Brady

conducted a further search of Loyd in an interview room.  (Tr. 15).  That search uncovered a

"cell phone and approximately 15 small clear glassine baggies containing crack and powdered

crack – powder cocaine," which Loyd had apparently placed in "his private areas."  (Tr. 15,

53-54).  Loyd also gave a statement at the police office.  (Tr. 48).  No dispute exists that Loyd

gave these statements after being advised of his *Miranda* rights.  (Tr. 2-3).

       Brady testified that Loyd was charged with "[e]xposure of a person," which is a

"violation" under New York State law.  (Tr. 16, 49).  Brady also testified that he does not always

arrest individuals for urinating in public, and his decision whether to do so depends on the

circumstances, including the individual's conduct and demeanor.  (Tr. 50-51).  Brady stated that

he had never met or seen Loyd prior to June 16, 2019, and that Loyd was not giving him "any

problems" that night.  (Tr. 50-52).

    **B.**    **Discussion**

       Brady's testimony establishes that the arresting officers did not have a warrant to

arrest or search Loyd on June 16, 2019.  (Tr. 55).  The government thus must prove by a

preponderance of the evidence that the officers' actions did not violate the Fourth Amendment.

*See United States v. Sacco*, 563 F.2d 552, 558 (2d Cir. 1977), *cert. denied*, 434 U.S. 1039

---

[7] After discovering the items in the satchel, Loyd was eventually connected with the carjacking with which
he is charged in the current indictment.  (Tr. 54).  At the time the officers encountered Loyd and the other men at the
intersection of North Street and Roycroft Drive, however, they were not looking for suspects related to the
carjacking.  (*Id.*).

(1978); *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988); *United States v. Jaiman*, 2018 WL 1870483, *7 (S.D.N.Y. 2018) ("[h]owever, once the defendant has established some basis for the motion [to suppress physical evidence], for example, by a preliminary showing of a warrantless search, then the burden shifts to the government to show, by a preponderance of the evidence, that the warrantless search was reasonable"); *United States v. Levy*, 217 F. Supp. 3d 643, 660 (E.D.N.Y 2016) ("[t]he burden is on the defendant to show that the search was conducted without a warrant[;] [t]he burden then shifts to the government to show by a preponderance of the evidence that the police had either reasonable suspicion or probable cause to justify their actions").

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. In order to seize a person without a warrant, a police officer must have probable cause. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir.) ("[a] warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed"), *cert. denied*, 555 U.S. 1056 (2008). Probable cause exists if "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. McFadden*, 238 F.3d 198, 204 (2d Cir.) (alterations in original) (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077 (1988)), *cert. denied*, 534 U.S. 898 (2001).

The Supreme Court has counseled that the probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S 213, 231 (1983)). In determining whether probable cause exists for an arrest, a reviewing court must examine the totality of the circumstances surrounding the arrest, *Illinois v. Gates*, 462 U.S at 230-31, judged from "the perspective of a reasonable police officer in light of his training and experience." *United States v. Delossantos*, 536 F.3d at 159. Probable cause requires no more and no less than a "reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. at 371 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Of course, "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

Here, Brady credibly[8] testified that the officers' probable-cause determination to arrest Loyd was predicated on New York's public exposure law and the officers' personal

---

[8] Loyd argues that Brady's testimony should not be credited because of Brady's "conflicting reports" and prior "inconsistencies" regarding the location of Loyd's alleged urination. (Docket # 39). As Loyd points out, Brady's police report for this incident indicated that Loyd was urinating "at the corner of North Street and Carter Street" and specified the address as 1454 North Street. (Tr. 8, 35). North Street and Carter Street do not intersect. (Tr. 35). Before the grand jury, Brady testified that Loyd was "urinating on the side of the corner store" at the "1400 block of North Street," which is "several blocks away" from the intersection of North Street and Roycroft Drive. (Tr. 35, 40). This corner store was located at 1454 North Street, and Brady testified that he was referring to this same location in both his police report and in his grand jury testimony. (Tr. 39-41). The intersection of North Street and Roycroft Drive is not in the 1400 block of North Street. (Tr. 38). Brady admitted these discrepancies and testified that he had made a "mistake." (Tr. 7-9, 35-42).

Brady's police report and grand jury testimony both identify the same location – one that differs from the location that Brady identified in his hearing testimony as the site where he observed Loyd urinate on the night of June 16, 2019. Regardless of whether this mistake was a "typographical error," as the government contends (Docket # 40 at 12), I nonetheless disagree with Loyd that the mistake taints the entirety of Brady's testimony so as to render it untrustworthy (Docket # 39 at 5). Photographic evidence offered by the government and Loyd – which Brady marked up during the suppression hearing to show where the incident took place – corroborated Brady's hearing testimony that he observed Loyd near the intersection of North Street and Roycroft Drive. (*See* G. Exs. 1, 2, 3; Defendant's Exhibit ("D. Ex.") 401). In addition, Lindauer's body camera footage from the incident demonstrates that the officers called in their location as "North and Roycroft." (G. Ex. 5 at 21:31:24). Moreover, no proof exists that any of Brady's testimony about his personal observations of Loyd (apart from the location discrepancy) are

observations of Loyd apparently urinating on a building near the intersection of North Street and

Roycroft Drive.  New York's public exposure statute provides that "[a] person is guilty of

exposure if he appears in a public place in such a manner that the private or intimate parts of his

body are unclothed or exposed."  N.Y. PENAL LAW § 245.01.  "Public place" in this context "has

no cut-and-dried meaning" and is interpreted and applied "in a manner that comports with its

purpose."  *People v. McNamara*, 78 N.Y.2d 626, 633 (N.Y. 1991) (interpreting the term "public

place" in New York's public lewdness statute, which, as with the public exposure statute, is

found in Article 245 of New York Penal Law dealing with "offenses against public sensibilities,"

an article that does not otherwise define the term "public place").  The New York Court of

Appeals has held that a place is considered "public" for purposes of Article 245 of New York

Penal Law when the "objective circumstances establish that [the exposure of a person]

committed there can, and likely would, be seen by the casual passerby, whose sensibilities the

statute seeks to protect."  *Id.* at 633-34; *see also United States v. Asan*, 2014 WL 948854, *6

(D.N.J. 2014) (*McNamara* "does not require that defendant be seen; but he must be in a place

where he could and likely would be seen").

       Exposure of person under Section 245.01 is a "violation."  N.Y. PENAL LAW

§ 245.01.  A "violation" is defined in New York as an "offense, other than a 'traffic infraction,'

for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed."  *Id.*

at § 10.00(3).  A violation is not, in other words, a "crime" under New York Penal Law, which is

defined as a "misdemeanor or a felony."  *Id.* at § 10.00(6).  Still, a police officer is plainly

---

inconsistent with Brady's prior records or testimony.  On this record, and considering Brady's demeanor, I credit his testimony about what he observed Loyd doing near the intersection of North Street and Roycroft Drive on the night of June 16, 2019.  *See, e.g.*, *United States v. Cancel*, 167 F. Supp. 3d 584, 590 (S.D.N.Y. 2016) (finding that "minor gaps in the record" in the form of "inconsistencies between the officers' testimony and certain documentary evidence" did not "undermine [the court's] conclusion that the officers testified credibly"[;] the "material facts" established by that testimony amounted to probable cause supporting defendant's arrest).

permitted to arrest a person without a warrant for committing "[a]ny offense" – which would incorporate a "violation" – when the offense is committed in the officer's presence. *See* NEW YORK CRIM. PROC. LAW § 140.10(1)(a) ("a police officer may arrest a person for . . . [a]ny offense when [an officer] has reasonable cause to believe that such person has committed such offense in his or her presence"); *see also Livecchi v. City of Geneva*, 2019 WL 315293, *5 n.21 (W.D.N.Y. 2019) (plaintiff's argument that "one cannot be arrested for committing harassment" was "manifestly [without] merit"; "[p]laintiff baldly asserts that no one can be arrested for committing Harassment in the Second Degree, since it is merely a violation [under New York law], and suggests that at most a person who commits such harassment can be issued an appearance ticket[;] [h]owever, that contention is incorrect") (citing NEW YORK CRIM. PROC. LAW § 140.10(1)(a)); *Hanson v. New York City*, 2018 WL 1513632, *11 (E.D.N.Y. 2018) (police officers had probable cause to arrest plaintiff based on their personal observations of plaintiff shouting at and then shoving an individual; "[e]ven assuming that [p]laintiff was not yet throwing punches at the time [the officers] intervened, the officers nonetheless had probable cause to arrest [p]laintiff for either disorderly conduct or harassment in the second degree[;] . . . [a]lthough both disorderly conduct and harassment in the second degree are only violations, New York [Criminal Procedure] Law permits police officers to arrest for violations committed in their presence"); *United States v. Cuevas*, 2016 WL 2766657, *3-4 (S.D.N.Y. 2016) (defendant's assertion that an arrest premised on unlawful possession of marijuana is "unlawful" because it is a "violation" under New York law was "mistaken" based on New York CPL § 140.10(1)(a); "[t]he defendant's arrest for unlawful possession of marijuana was lawful under New York law and the Fourth Amendment[;] . . . [b]ecause there was authority to arrest under New York law, the defendant's arrest, which was based on the police officers' contemporaneous observations

that the defendant was in possession of a substance they believed to be marijuana, did not violate

the Fourth Amendment").

          Initially, I find that it was reasonable for the arresting officers to conclude that

Loyd was urinating in public based on their personal observations of Loyd from the time they

drove past him to the time of his arrest.  As he was traveling southbound on North Street, Brady

observed Loyd facing the building near the intersection of North Street and Roycroft Drive

"appear[ing] to . . . urinat[e] against the building."  (Tr. 9, 31).  He noted that Loyd was facing

and standing "inches away" from the building and appeared to be trying to "shield himself from

the public," had his hands near his groin area, and had his pants pulled down to about five or six

inches above his knees, revealing his underwear.  (Tr. 9, 29, 33-34).  Moreover, as he

approached Loyd, Brady observed Loyd "immediately" pull up his pants and begin to walk

towards the officers (Tr. 10, 61); saw what he believed to be urine on the side of the building

where he originally saw Loyd (Tr. 62); and observed, based upon Loyd's characteristics and

mannerisms, that Loyd appeared to be "very intoxicated" (Tr. 57-58).[9]  Based on the facts about

which Brady credibly testified, I determine that a reasonable officer in Brady's position –

particularly one who, like Brady, has observed men urinating in public many times and has had

experience arresting or issuing citations to individuals for urinating in public (Tr. 50-53, 59) –

could easily conclude that Loyd was urinating against the building.

---

       [9]  Because Brady personally observed what formed the basis of his decision to arrest Loyd, this Court need
not determine, as Loyd contends, whether the officers' actions would have violated the Fourth Amendment had they
not personally observed what they believed to be Loyd urinating on the building.  (*See* Docket # 39 at 7 (citing
*Mikulec v. Town of Cheektowaga*, 909 F. Supp. 2d 214, 225-26 (W.D.N.Y. 2012) ("[a]n arrest might be considered
unreasonable under the Fourth Amendment if the officer *was not present* when an alleged minor offense occurred[;]
. . . [h]ere . . . there is more reason to question the reasonableness of [plaintiff's] arrest because (1) the offense was
committed *outside of the officer's presence* and (2) [plaintiff] was charged with only a 'violation,' not a
misdemeanor") (emphasis supplied))).

In addition, I find that the totality of the circumstances established probable cause to believe that Loyd was violating New York's public exposure law.  In making this finding, I am unpersuaded by Loyd's arguments that he could not have violated this statute because he was allegedly "[u]rinating against the side of a building on private property while shielding [his] genitals [from public view]."  (Docket # 39 at 6).  As stated above, and contrary to Loyd's view, whether a place is "public" for purposes of Article 245 of the New York Penal Law does not necessarily depend upon whether the location is privately or publicly owned; nor does it necessarily depend on whether the individual committing the violation intended to be in or out of public view.  *See People v. McNamara*, 78 N.Y.2d at 633-34.  Rather, the inquiry is whether the "objective circumstances" establish that the individual committing the violation is in a place where he or she can, and likely would, be seen by a "casual passerby."  *See id.*; *see also United States v. Asan*, 2014 WL 948854 at *6.

Here, the officers reasonably concluded, based on their personal observations and experiences, that Loyd was in a "public place" while urinating.  Not only were the officers able to view Loyd's conduct from their patrol vehicles on the street, but the photographic evidence admitted during the suppression hearing demonstrates that the building on which Loyd was observed urinating was located on the corner of two streets, such that Loyd could easily be seen from either North Street or Roycroft Drive.  (*See* G. Ex. 2; D. Ex. 401).  The officers were reasonable in determining that Loyd's conduct could, and likely would, have been seen by a member of the public passing the building on the corner of North Street and Roycroft Drive.  Moreover, given these circumstances, the officers were justified in concluding that if Loyd was urinating in public, a "private or intimate part[] of his body [was] unclothed or exposed."  *See* N.Y. PENAL LAW § 245.01.  Accordingly, the RPD arresting officers had probable cause to arrest

Loyd without a warrant for committing a violation of New York's public exposure law in their presence.  *See* NEW YORK CRIM. P. LAW § 140.10(1)(a).[10]

        In light of my determination that probable cause existed for Loyd's warrantless arrest, I reject his contention that the evidence seized and his post-arrest statements should be suppressed as fruit of an unlawful arrest.  Rather, the tangible evidence was seized incident to a lawful arrest.  *See*, *e.g.*, *Diaz*, 854 F.3d at 205 ("[t]he search-incident-to-arrest doctrine is an exception to the general requirement that an officer must obtain a judicial warrant supported by probable cause before conducting a search") (citing *Riley v. California*, 573 U.S. 373, 384 (2014)); *United States v. Cuevas*, 2016 WL 2766657 at *4 ("[l]aw enforcement's search of the defendant's person incident to his lawful arrest was itself lawful[;] . . . [a]s a result, the defendant has no meritorious basis to suppress the bag of marijuana discovered on his person").  The post-arrest statements, although made in response to custodial interrogation, were preceded by *Miranda* warnings.  Accordingly, I recommend that the district court deny Loyd's motion to suppress the tangible evidence and statements.

---

[10]  Even if the RPD arresting officers had been mistaken in their belief that Loyd's apparent public urination constituted a violation of New York's public exposure law, such a mistake would not necessarily establish that Loyd was subjected to an unconstitutional search and seizure.  *See United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) ("an officer's assessment [of whether probable cause exists to arrest a person] need not 'be perfect' because 'the Fourth Amendment allows for some mistakes on the part of government officials,' including 'reasonable . . . mistakes of law'") (quoting *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014)), *cert. denied*, 138 S. Ct. 981 (2018); *see also Herring v. United States*, 555 U.S. 135, 139 (2009) ("[w]hen a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to search or seizure has not necessarily been the victim of a constitutional violation").  Therefore, particularly in the absence of any contrary authority provided by Loyd, I find that the arresting officers' belief that public urination violated New York's public exposure law "was a reasonable . . . assessment of the scope of that law at the time it was made."  *See United States v. Diaz*, 854 F.3d at 205.

II.    **The Photographic Identification Procedure**

I turn next to Loyd's motion to suppress evidence of the photographic

identification.  (Docket ## 29 at 8-9; 39 at 9-11).

A.    **Background**

This Court also conducted a bifurcated *Wade* hearing on January 23, 2020,

considering only whether the identification procedure utilized was unduly suggestive.[11]

(Tr. 65-90).  The government called RPD Investigator Ebony Brown to testify about the

identification procedure she conducted on June 20, 2019.  (*Id.*).  Brown testified that she has

been employed by the RPD since 2005, serving first as a patrol officer, and then as a police

investigator since July 2018.  (Tr. 66).

On June 20, 2019, Investigator Robert Henkes ("Henkes") asked Brown to assist

with an investigative "double blind photo array."  (Tr. 67-68).  According to Brown, a double

blind photo array is a procedure in which the person "showing the photo array does not know the

specifics of the case, does not know the suspect in the case, does not know where the suspect is

placed in the photo array[,] [and] [does not] have any details of the case."  (Tr. 68).  Brown

testified that Henkes did not provide her with any information before the procedure, including

the identity of the person to whom she would be showing the array, or any information on the

underlying investigation or crime.  (Tr. 68, 82-83).[12]

Brown testified that she met with the witness on June 20, 2019, at approximately

7:30 p.m., in a small interview room at the RPD's east division office.  (Tr. 70-71).  Henkes had

---

[11]  A *Wade* hearing refers to a hearing held pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to determine whether an out-of-court identification resulted from an impermissibly suggestive procedure and, if so, whether it is independently reliable.

[12]  Brown testified that she knew the investigation had to do with robbery in the first degree because that information was provided on the photo array witness instruction form.  (Tr. 75, 83; *see also* G. Ex. 7 at 1).

given Brown the photo array in a closed manila folder, which she did not open before meeting

with the witness, and the instructions for the procedure were on top of the folder.  (Tr. 69-70).

Brown's sole purpose for meeting the witness was to conduct the photo array procedure, and

Brown did not interview the witness in any manner before the procedure.  (Tr. 71).

Brown testified that she read the instructions verbatim to the witness.  (Tr. 71,

73-74; *see also* G. Ex. 7 at 1).  Those instructions consisted of the following:

> As part of the ongoing investigation into a crime that occurred on
> [June 16, 2019] at [115 Gothic Street], I am going to show you a
> photo array[;] [i]t consists of six photos, and each photo has a
> number [below] it[;] [t]ake as much time as you need to view the
> photos[;] [t]he person who committed the crime may or may not be
> included in the photos you will be viewing[;] [d]o not assume I
> know who committed the crime[;] [d]o not look to me or anyone
> else in the room for guidance during the procedure[;] [p]ersons
> shown in the photos may not appear exactly as they did on the date
> of the incident because features, such as head and facial hair, are
> subject to change[;] [p]hotos may not always show the true
> complexion of a person; it may be darker or lighter than shown in
> the photo[;] [p]ay no attention to any markings that may appear on
> the photos, or any other differences in the type or style of the
> photos[;] [d]o not discuss with any other witness what you see,
> say, or do during this procedure[;] [a]fter you have had an
> opportunity to view the photo array, I will ask you the following
> three questions: 1) [d]o you recognize anyone in the photo
> array?[,] 2) [i]f you do, what is the number of the person you
> recognize?[,] 3) [f]rom where do you recognize that person?[;] I
> may also ask you follow up questions.

(Tr. 71-74; G. Ex. 7 at 1).

After the witness indicated that he understood the instructions, Brown handed the

witness the closed folder containing the photo array and then stepped "about 5 feet behind [the

witness] so not to distract or not to be suggestive to him."  (Tr. 75).  Brown stated that the

witness could not see her, but that she could "kind of watch [the witness] look[] at the photo

array."  (*Id.*).  The photo array contained no markings on it.  (Tr. 75, 77-78).

16

Brown testified that when the witness opened the folder, which was the first time Brown herself had viewed the photo array, the witness "immediately" said, "I got it." (Tr. 75). Brown asked the witness what he meant, and the witness responded that he saw the individual who "robbed [the witness] and his cousin" and identified the individual in photo four of the six-photo array as the suspect "[f]rom the night of the incident." (Tr. 69, 75, 79, 85). Brown testified that the witness said he recognized the individual in photo number four as the suspect because of "the way his dreadlocks fell on his face." (Tr. 79; *see also* G. Ex. 7 at 2).

After identifying the suspect, the witness circled the number four underneath the fourth photo in the array and initialed and dated the array. (Tr. 76, 78; *see also* G. Ex. 8). The witness then completed the "quick deposition" portion of the procedure, reviewed his statement, and signed it. (Tr. 73, 76; *see also* G. Ex. 7 at 2).

Brown testified that "way after" the photo array procedure had been completed and Brown had submitted the paperwork to her supervisor, she learned that the individual depicted in the fourth photograph was Loyd. (Tr. 80, 87). Brown testified that she also later learned details about how Investigator Elliott Rodriguez ("Rodriguez") created the photo array; Brown herself did not participate in the creation of the photo array. (Tr. 80, 84-85). Specifically, Brown discovered that Rodriguez added neck tattoos to at least some of the photographs in the array, but she did not know which individuals had actual neck tattoos. (Tr. 81-82).

**B.**   **Discussion**

Loyd maintains that the photo array was "unnecessarily suggestive because the *only* photo in the array where a person had a prominent dreadlock coming down over his face

was Loyd's" and the witness used this characteristic to identify Loyd in the photo array.  (Docket # 39 at 11 (emphasis in original)).  I disagree that the array was unduly suggestive.

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive.  *Id.*  To decide whether a photographic array is unduly suggestive, a court should consider several factors including "the size of the array, the manner of presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must consider "whether the picture of the accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit."  *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (citations and quotations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

On the record before me, I find that the identification procedure Brown conducted on June 20, 2019 was not unduly suggestive. First, the manner in which Brown presented the array to the witness did not suggest to the witness which, if any, photograph to select. Brown credibly testified that she performed a double-blind photo array, meaning that she did not know any specific information about the underlying investigation, including who the suspect was or where the suspect was placed in the photo array. (Tr. 67-68). In fact, Brown had not even seen the photo array prior to giving it to the witness in a closed manila folder. (Tr. 75). Moreover, the instructions that Brown read verbatim to the witness included the advisements that "[t]he person who committed the crime may or may not be included in the photos [the witness would] be viewing" and that "[p]ersons shown in the photos may not appear exactly as they did on the date of the incident because features, such as head and facial hair, are subject to change." (G. Ex. 7 at 1). In addition, Brown did not interview the witness before conducting the procedure and stood approximately five feet behind the witness while the witness viewed the photo array so as not "to distract" or "be suggestive." (Tr. 71, 75). Based on Brown's credible testimony, I find that the procedure employed on June 20, 2019 was not unduly suggestive. *See United States v. Williams*, 2015 WL 429087, *17 (W.D.N.Y.) (manner of presentation of photo array not unduly suggestive where it did not suggest to the witness which, if any, photograph to select), *report and recommendation adopted by*, 2015 WL 3454430 (W.D.N.Y. 2015); *United States v. Guzman*, 2015 WL 774211, *7 (W.D.N.Y. 2015) (same).

Nor is there anything about the array itself, which this Court has reviewed, that was unduly suggestive. Loyd's photograph is one of six color photographs of different, similarly-aged, African-American men. (G. Ex. 8). All are close-range head shots of men, three of whom appear to be wearing white t-shirts, while the other three are wearing colored shirts.

19

All six men have similarly-styled facial hair, and all have visible neck tattoos.  Moreover, all six men have dreadlocks of various lengths; two have dreadlocks falling on their foreheads, although Loyd is the only one depicted with a dreadlock covering part of his eye.  (*Id.*).

Even though the witness specified Loyd's dreadlocks as his identifying characteristic, I do not find that the photograph's depiction of Loyd's one dreadlock on his face is significant enough to "suggest to [the] identifying witness that [Loyd] was more likely to be the culprit."  *Jarrett v. Headley*, 802 F.2d at 41; *see United States v. Bubar*, 567 F.2d at 198-99 (array not unduly suggestive even though defendant's hair was longer and darker and his moustache was darker and bushier than filler photographs); *Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 336 (W.D.N.Y. 2011) ("there is no shortage of cases finding lineups and photo arrays acceptable despite differences in hairstyles") (quotations omitted) (collecting cases).  Indeed, other than one individual who appears to have hair noticeably shorter than Loyd's, all of the other individuals have roughly the same length and style of hair; the man with the shorter hair is shown with dreadlocks falling on his forehead.  In other words, the depiction of Loyd with one dreadlock falling on his forehead is not enough to make him so stand out from the other individuals as to violate due process, particularly in the absence of evidence that the witness had previously described Loyd as having dreadlocks that fell on his forehead.  *Cf. Frazier v. New York*, 187 F. Supp. 2d 102, 111 (S.D.N.Y. 2002) (lineup suggestive where plaintiff was only one with "alternating-length dreadlocks, and this hairstyle was the only consistent, distinctive feature in [the witness's] various descriptions"), *aff'd*, 156 F. App'x 423 (2d Cir. 2005).

On this record, and for these reasons, I recommend that the district court deny Loyd's motion to suppress the photographic identification.

## **<u>CONCLUSION</u>**

For the above-stated reasons, I recommend that the district court deny Loyd's motions to suppress tangible evidence and statements and to suppress evidence of a photographic identification.  (Docket # 29).

     *s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      April 28, 2020

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

    **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

    **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[13]

    The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

    <u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

    The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.</u>

    Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                  *s/Marian W. Payson*
                                  MARIAN W. PAYSON
                              United States Magistrate Judge

Dated: Rochester, New York
       April 28, 2020

---

[13] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).